STEVENS v. STEVENS.

1. MORTGAGES—FORECLOSURE—ACCOUNTING.

In a suit by the wife of defendant to foreclose two mortgages which her husband had given to her as security for money advanced to him, as complainant claimed, evidence considered, and *held*, to support her contention.

2. SAME—ACCOUNTING—EQUITY.

The defendant husband was not entitled to an accounting, where he abandoned the farm mortgaged and went to Canada, leaving his wife in possession of the farm and some of the personal property, in order to escape pressing obligations due to creditors and other mortgagees, and where he borrowed money from her from time to time and it appeared that the question of the amount obtained by the complainant from the farm was involved in an action on the law side of the court.

3. FRAUDS, STATUTE OF—PARTIES—ORAL CONTRACTS—PART PERFORMANCE.

Where defendant had become incompetent and been committed to the charge of a guardian, and his wife claimed to hold various claims against him, including two mortgages upon his real property, of which she remained in possession, and where she orally agreed with his guardian and heirs to pay the heirs of defendant a stated sum for their interest in his property, giving notes to them for the agreed consideration, before a writing satisfactory to all parties had been executed, specific performance could not be granted the guardian of the husband in a foreclosure suit to which none of the heirs were parties defendant, and a cross-bill was properly dismissed even if the contract was enforceable.

4. CONTRACTS—FUTURE OR CONTINGENT INTERESTS—PUBLIC POLICY.

Agreements to sell or convey the prospective interests of heirs in their living ancestor's estate are not regarded with favor and are rarely, if ever, sustained, without the consent of the ancestor, who is generally held to be entitled to know the situation of his heirs with reference to each other, to himself and his property. His insanity or incompetency is not a ground for making an exception to the general rule.

Appeal from Cass; Des Voignes, J. Submitted April 15, 1914. (Docket No. 36.) Decided July 24, 1914.

Bill by Agnes Stevens against Daniel W. Stevens for the foreclosure of two mortgages. From a decree for complainant, defendant appeals. Affirmed.

*Clarence M. Lyle* and *Marshall L. Howell,* for complainant.

*Stewart & Sabin* and *Stewart & Jacobs,* for defendant.

STEERE, J.    This bill was filed on November 7, 1912, for the purpose of foreclosing two mortgages given by defendant on his farm of 288 acres located in Cass county, Mich., one for $5,000, given directly to complainant, and the other for $2,001.22, given to the Jones Exchange Bank, of Marcellus, Mich., but subsequently assigned to her.    Owing to the fact that the principal was not yet due on the latter mortgage, and the amount of interest in default was small, it was withdrawn from consideration by permission of the court, and on motion of complainant's solicitor the bill was dismissed as to it without prejudice.    Upon the hearing a decree was rendered foreclosing the $5,000 mortgage, given complainant, for the sum of $6,587.12, being found due for principal and interest accrued since said mortgage was given on April 20, 1909.

At the time of these proceedings defendant was mentally incompetent.    An answer with cross-bill was filed by Samuel Stevens, his son and general guardian, admitting the execution of said mortgage, but denying its validity and asserting it was without consideration, alleging that complainant had contracted to purchase the interests of defendant's heirs in said farm, had been in possession of and realized profits from the same, praying that said mortgage be declared null and void, and asking affirmative relief by an accounting, decree for specific performance of contract, and an injunction to restrain certain proceedings at law which had been commenced by her.

Defendant and complainant were husband and wife, having been married in the State of New York in

1904. He was a Michigan farmer, a widower well along in years, and had six children by his former wife, all living and of age when this suit was heard. She was then about 40 years of age, had not been previously married, was a resident of Canada where she owned some inherited property both real and personal, and had followed no occupation beyond helping in the household of her parents when they were living. She had little knowledge of business matters, her interests being cared for by an attorney and agent. She first met defendant at her sister's home in New York, where she was visiting and where they were married a few months later. While their courtship was in progress defendant tested her sincerity by borrowing $1,500 from her. Immediately following their marriage she accompanied him to his farm in Cass county, where they thereafter made their home and lived as husband and wife until shortly before this suit was begun, excepting when he was absent in the Northwest at intervals as hereafter related. Complainant was without previous experience in farm life, but appears to have adapted herself to it and been a faithful helpmate to defendant, not only caring for his household but interested and helpful in farm matters. She testifies:

"When I went up there on the place with him, I had to do a little of everything. I had to milk, and I often fed the stock. I had never done that before. It seems I had to learn."

Two children were born of the marriage, a boy and a girl, respectively 8 and 6 years old when this suit was heard.

Though defendant had a large farm with a full complement of stock, tools, etc., and was apparently operating on a rather large scale, his methods were such that he was not successful financially. His farm was mortgaged and he was in debt when married to com-

plainant. This condition continued and his indebtedness increased. It is clearly shown that he continued to apply from time to time the test of loyalty he found so satisfactory during their courtship and frequently borrowed money from complainant. She not only helped him financially at different times by direct loans, but by paying items of his indebtedness and expenses of the farm. She is shown to have mortgaged her Canadian property at one time to raise money for her purposes in Michigan; the mortgage being yet unpaid.

There are four mortgages upon defendant's farm, the one for $5,000 to complainant being the third, and the one for $2,001.22 which she holds by assignment being the fourth. Two earlier mortgages aggregate $6,000 principal, with considerable accrued interest.

As his obligations increased and creditors were pressing him, and about the time he gave his wife this third mortgage, defendant conceived the project of retrieving his fortunes by journeying to and locating upon land in the Canadian Northwest. To that end, in May, 1909, he took from his farm and loaded a car with supplies, farming implements, tools, stock, etc., including two spans of horses, and started for Alberta, leaving complainant at home to run the farm with what was left as best she could; the parting though not final test of her loyalty being the requisite money to pay freight on his car to Alberta. Defendant located 320 acres of wild land in Alberta and proceeded to subdue and improve the same, devoting most of his time and all the money he was able to secure to that purpose until 1911. He was back home from time to time and gave directions as to the management of the Cass county farm, but left substantially all the burden of it on complainant, and was constantly importuning her by mail for more money, in an interesting series of letters, freighted with accounts of the

country and the hardships he experienced, prayers, profanity, and great expectations. Her style of correspondence was somewhat similar and responsive from her viewpoint, telling of her efforts and the troubles which beset her in trying to run the farm, complaining of his having notes "all over —'s creation," at one time inquiring, in answer to an appeal from him for more money, "what was the use of your leaving me here, knowing you was in debt to everybody?" In a letter written by him on February 28, 1910, to Mr. Jones, of the Jones Exchange Bank, where he had borrowed money, he throws some light on his reason for going West and his financial embarrassments. It is, in part, as follows:

"I suppose you think I never intend to sign your note and answer your letter. I tell you —— I don't live in Michigan now. * * * It is almost 40 miles to town and the last three weeks it has stormed and blowed so bad and the most of the time it has been down to 38 and 40 degrees below zero and for 20 miles there ain't a house on the road. * * * I told her (complainant) in the fall to go and see you. She wrote me she had been and seen you and fixed it up all right and I supposed it was satisfactory. * * * I am willing to give you a mortgage, but I would like it to run 6 years because I will not get the deed of the last 160 for six years. Then will sell out here or back in Michigan and pay up. * * * I came out here so as to save the home place. * * * If you will draw up or have one drawn up running six years, so whenever I can pay you $300 a year * * * that will give me a chance for my life and I will get the old lady to discharge her mortgage on the farm and take one out here. * * * Now I think between God and man I have agreed to do what is right. If you will send me such a mortgage I will sign it and send it back as quick as I can and if she won't do so, then I will come back and you may jump on the farm and take it."

He was home three times in 1909 and once in the latter part of 1910, remaining during a portion of the

winter, until March, 1911, and was back two weeks in August, 1911, and finally returned on December 4, 1911. During his absence complainant, at his request, undertook to keep an account of her receipts and expenditures in connection with the farm. This consisted of items jotted down in a book at irregular intervals, as she testified, to show "that I didn't waste any of the produce of the farm or anything like that," and for defendant to look over when he came home. He is shown to have examined and approved them at different times when home, with the exception of the last year. In that connection it is urged that defendant is entitled to an accounting, because complainant is shown by her own books to have received several thousand dollars from the proceeds of the farm for which she has not accounted. That question is also involved in an action on the law side of the court, brought by her to recover for money loaned defendant during the time he was in the West, subsequent to the date of the $5,000 mortgage here involved. It is sufficient for the purposes of this case to state we are well satisfied nothing is shown in that connection for which she should be called upon to account in the foreclosure of this mortgage. It appears from the record that complainant, a woman with limited knowledge of farming and little experience in business, had been trying for nearly three years to maintain and run this farm, after it had been partly stripped of stock and tools by defendant, at the same time, and while supporting herself and children, sending him money in response to his urgent importunities frequently and in considerable amounts as his written acknowledgments and other written evidence shows. We are convinced, under the facts proven, that she could not and did not accumulate any reserve fund, at least beyond that she sent defendant, out of the proceeds of this farm, which he writes he went West to save from his cred-

itors and which he apparently had been unable to run profitably when in charge.

We fully agree with the conclusions of the learned circuit judge that this mortgage represented money loaned by complainant prior to its date and which was never paid, either principal or interest; and that defendant is not in this suit entitled to any accounting in relation to her management of the farm.

The only remaining question urged by defendant is the alleged contract between complainant and defendant's heirs.

Shortly after defendant's return home in the fall of 1911, he suffered a stroke of paralysis, as a result of which he became incompetent and sank into a helpless condition both physically and mentally, his mind and memory so impaired that he was incapable of transacting any business or even caring for himself. Complainant was desirous of having him sent to an asylum, but his son Samuel Stevens, who lived in Battle Creek, objected to this course, and being appointed guardian by the probate court took his father home with him, and as guardian proceeded to take charge of his estate. He assumed to have control of, and direct operations upon, the farm during the summer of 1912, though residing in Battle Creek. Complainant continued to live upon the farm as before and participated more or less in what was done there, boarding the hired help without pay and furnishing much of the family supplies, though it appears to have been recognized that he was in authority as guardian. The heavy indebtedness of the estate and unsettled condition of affairs were a general source of anxiety, uncertainty, and dissatisfaction. In the early part of the summer she conferred with the guardian, Samuel Stevens, another stepson named James Stevens, and a son-in-law of her husband named Frank James, as to the debts and difficulties which surrounded the

estate and the surplus, if any, which might be realized above the growing indebtedness. A proposal was broached to her by one or more of them that she buy out her husband's heirs and take the assets for whatever equities there might be. She at first favored their proposal, and after listening to their appraisal and plan of procedure agreed that she would buy out the six stepchildren for $3,000, or $500 each, they to make her a proper transfer of their interest as heirs of defendant's estate in Cass county, but subsequently decided not to do so and refused to consummate the deal. The subject was, however, broached occasionally and discussed persuasively by the son-in-law until she again, in September, concluded to buy the heirs out. James undertook to procure their consent to take $500 apiece, and stated to her he had been told by the guardian that he would have nothing to do with it unless she put up something to show she meant business. She agreed to give notes for the amount; and he drew up five notes for $500 each. Having some time before loaned over $500 to the guardian, she signed no note for him. It is claimed and denied that the guardian thereupon surrendered control and possession of the property to her. There is evidence that some steps were taken to that end, though to what extent is uncertain, as she had been living upon the farm and participating in its affairs all the time, and the guardian had been away, except for occasional visits, attending to his own business affairs in Battle Creek. A contract was prepared providing for the sale and purchase of the prospective interests of the six stepchildren and signed by them; but, when it was presented to complainant, she claimed to have learned in the meantime that she had been deceived and misled as to their rights and conditions generally. She refused to sign the contract and, on October 22, 1912, demanded back her notes from James to whom she

had delivered them, and he refused to comply. She thereafter, on November 7, 1912, filed this foreclosure bill and began an action in attachment against her husband. Of this contract the learned circuit judge said and found:

"It is plain to me also that the complainant, the wife of the defendant, is a woman not versed in the affairs of the business world and has had but very little experience in that respect in former years; that she was ignorant of the law and of her rights in this case. I further find that while she was appointed guardian for her two minor children, the issue of her marriage with the defendant in this case, which children are five and six years years of age, that the proceedings had in the sale of the land in this case did not contemplate or secure to these children the rights which they are entitled to under the statute. I think that the notes which were given and held by Frank James, who by the way is a son-in-law of the defendant, were given without consideration, and that the contract which was therefore to be made and executed and the giving of which these notes were based upon, although not signed or even executed was in fact not in accord with the oral arrangements in either the first or second so-called contract of agreement. * * * Defendants have failed in their cross-bill to maintain any right to compel the performance of this oral contract and agreement."

While it might be contended with some force under certain circumstances that this contract had progressed to a point of performance which relieved it from the statute of frauds, the facts in this case fully sustain, in our view, the final conclusion reached by the trial court. None of the heirs of defendant are parties to this suit. His guardian asks for him specific performance of an alleged contract to which he was not a party, to which he did not and could not consent; its purpose being to dispose of prospective interests in his estate before he was dead. Even were it an enforceable contract, it was not made with any party to this suit.

This contract contemplated a sale of·a prospective interest by heirs apparent, a sale void as a rule under the common law, sometimes enforced in courts of equity and more rarely, under the doctrine of estoppel, in courts of law. Such sales, as a rule of public policy, are not regarded with favor, and are rarely, if ever, sustained without the consent of the ancestor where that question is raised; the reason being that the ancestor is entitled to know the situation of his heirs with reference to each other, to himself, and his property, and by keeping him ignorant of the sale he is unwittingly led to leave his property to a stranger without his knowledge or consent, which operates as a fraud on the ancestor.

This question is fully discussed, with many authorities cited in the annotations to *McCall* v. *Hampton*, 98 Ky. 166 (32 S. W. 406), where reported in 33 L. R. A. 266 (56 Am. St. Rep. 335), and need not be elaborated here.

Under the general rules upon this subject to be drawn from the leading authorities, we conclude the contract under consideration is not enforceable either at law or in equity. The principles applicable here are concisely stated in the syllabus (which is borne out by the text) of *McClure* v. *Raben*, 133 Ind. 507 (33 N. E. 275, 36 Am. St. Rep. 556), as follows:

"Where a person conveys his expectant interest in his ancestor's estate, such contracts being regarded with disfavor by the law, and as against public policy, before such contract can be enforced it must be alleged and proven that there was neither fraud nor oppression, and that the ancestor had knowledge of such contract, and acquiesced therein, and the fact that the ancestor is insane, and incapable of consenting to the contract, constitutes no exception to the rule."

The decree is affirmed, with costs.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and·MOORE, JJ., concurred.